JONES, Justice:
The venue of this charge was in Bolivar County, from which county a change was granted to Coahoma County. On trial in the circuit court orí a charge of murder appellant was convicted of manslaughter and sentenced to ten years in the state penitentiary. From this conviction she appeals. For the reasons hereinafter stated, we are compelled to reverse and dismiss the case.
Appellant, a widow, had known the deceased Dr. Ringold for a number of years prior to 1962 when she moved from Hammond, Louisiana, to Cleveland, Mississippi, where on July 4, 1964, she and Dr. Ringold were married. Appellant had a daughter who had become retarded from an attack of spinal meningitis. This child lived in the home with her mother, Mrs. Wilson, at the time of the tragedy hereinafter detailed. Dr. Ringold, a widower, also had one child by the name of Sadie Mae Buchanan. She *446 was approximately twenty-four years old at the time of her father’s death. Prior to their marriage, Mrs. Wilson and Dr. Ringold, as the appellant testified, “enjoyed each other’s company, going to dinner together and fishing and hunting together,” and had a “wonderful” friendship. After the marriage, they, together with her afflicted daughter, moved into the house owned by him in Cleveland, Mississippi, where they apparently lived happily for a period of three or four months. The decedent, Dr. Ringold, was a practicing physician, and enjoyed a good reputation and much popularity. Dr. W. T. Fitzgerald, who had practiced medicine in partnership with him for a number of years, testified Dr. Ringold became an alcoholic some years prior to his death. The relationship between the parties as husband and wife became increasingly unbearable until the fall of 1965 when they separated and Mrs. Wilson filed suit for divorce which was uncontested. It was an amicable separation, and the decree was granted November 10, 1965.
Appellant testified that after the divorce was granted she and the doctor agreed to be friends. On the night of Monday, November 15, following the decree and preceding the Friday on which the tragedy occurred, the doctor invited Mrs. Wilson to his apartment for dinner and she accepted. The father of the sheriff of the county, living in the same apartment building, came and had dinner with the doctor and Mrs. Wilson. Her undenied testimony was that they had a wonderful evening and discussed her impending trip to Mexico. Again, on Tuesday night, November 16, the doctor and Mrs. Wilson had dinner together. This time, the dinner was at her home, and consisted of some squirrels which the doctor had asked her to cook. There was no argument or unpleasantness on this occasion.
On Thursday, November 18, about 8:30 or 9:00 p. m., while Mrs. Wilson was making preparations for a trip to Mexico, she received a call from the doctor. He invited her to join him for dinner and when she replied that she was having a drink he told her to bring her drink. He also requested that she lend him a 20-gauge shotgun she had which had belonged to her first husband. It had a “polychoke” by which the shot pattern could be made larger or smaller. The doctor had had cataract operations and he thought this gun could be adjusted to give him a better pattern than his own gun. The gun was loaded with three shells, and Mrs. Wilson said she had loaded it back in October when she and her daughter moved into the house where they were living alone.
She went in her car with her drink and the gun to the apartment where the doctor lived. When she entered the apartment with her purse and drink in her hand (having forgotten the gun) she found Dr. Ringold shredding lettuce in preparation for a Mexican dinner. She finished her drink and, while Dr. Ringold was getting the oven hot, went to her automobile, got the shotgun (having been asked by the doctor if she had forgotten it), and returned to the apartment. When she re-entered, she laid the gun on the floor by the coffee table in the living room, but after he “stumped” his toe on the stock, Dr. Ringold requested that she lay it on his bed. After this, appellant testified that she and the doctor had a Mexican dinner of tacos; that they had had a drink while the tacos were cooking, and he had requested that she mend two of his coats before she left for Mexico.
After dinner they had another drink. Then she advised the doctor as to rearranging the furniture in the living room area of his apartment. They then entered the south bedroom to watch television, but the reception was bad. The doctor mentioned to her that she had left a pair of white gloves on the previous Monday night. He secured the gloves from a drawer, gave them to Mrs. Wilson, and she put them on the desk in the south bedroom. They were both fully clothed, and there is no evidence of anything improper having occurred.
*447 About 11:00 p. m. the doctor went to the kitchen to fix himself another drink and there received a telephone call. He returned to the bedroom and told Mrs. Wilson that he had gotten a call. She volunteered to drive him on the call, but this offer was declined. He asked her to wait for him.
After he left, she picked up a paper to read and then laid down near the head of the bed in the south bedroom. There she went to sleep. It seems she placed the last drink the doctor mixed for her on the desk by the bed at the time she laid down. She also testified that she removed a barrette from her hair and placed it on the desk.
The doctor returned to the apartment about 2:10 or 2:15 a. m. He stopped his car south of the apartment building on the east side of the street which runs in front of the apartments. Mrs. Wilson testified that she was awakened by the slamming of the apartment door. She glanced at her watch, saw the time, stood up, and began putting on her shoes. She was standing between the bed and the desk, when Dr. Ringold appeared in the doorway and asked where she thought she was going. His face was flushed and had a vicious expression. She requested that he get his coats which she was to mend, and he replied, “You are not going any place, get undressed and get in bed.” To this she replied that that was not in the bargain. His mood was described as violent when he started toward her with his hands and arms outstretched. She said the last time she had seen that vicious expression on his face was on the night of August 2, 1965, when he had struck her, knocked her down and broken her pelvis, which event will be hereinafter discussed.
She was standing on the east side of the bed, near the desk, or the southeast corner of the bed. When he started toward her, there was nowhere to go to escape him. She grabbed the gun off the bed for the purpose of frightening him. She pumped the gun, but he kept advancing and she backed as far as she could. He struck the gun, knocking it up, and it fired into the ceiling. She said that she pushed the doctor with the gun and when she pumped it again it went off and shot him. She had no knowledge of her finger being on the trigger.
Her testimony shows that after the doctor was shot she dropped the gun and blacked out. When she regained consciousness she was sitting in a chair at the desk by the bed in the south bedroom. She said the first thing she did then was to call the sheriff and the next thing was to call her sister, Mrs. Thornton. After that, it is her testimony that she remembered nothing until she was in the hospital with a blood pressure band around her arm and a nurse standing over her. She did testify she had a vague recollection of picking an unfired shell off the bed.
Dr. John P. Milam examined the defendant around 5:00 or 6:00 a. m. He found her blood pressure high, 190/110; her pulse rapid; and her heartbeat fast with some palpitation. She was very apprehensive and nervous, and suffering with a psychogenic-type shock in which there is severe traumatic mental disturbance.
Dr. William Bobo described psychogenic shock as the non-functioning of the mind after it has been subjected to the impact of an idea with which it cannot cope. A person so effected could experience a blackout period or a period of semi-consciousness. He said there would be a loss of awareness of his surroundings and, also a loss of awareness of his own mental functions. He would be blacked out but still functioning physically. In response to a hypothetical question describing the action and conduct of the defendant he stated that he thought that question described a psychogenic shock that a person did suffer, and there was no other good explanation for either the physical findings or the behavior of the person’s mind. It had been shown that the lady blacked out after the shooting for a period of at least forty-five minutes.
*448 In Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), it was stated by this Court:
“ * * * It has been for some time the established rule in this state that where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.” 165 Miss. at 209, 147 So. at 482.
Since that time this principle has continued to be recognized, the Court in some cases adopting it and in some holding that the facts did not fit the rule. But it is still the law in this state.
Appellant argues that, since she was the only eyewitness to the crime, the court erred in declining her motion for a peremptory instruction based upon this theory. The state argues that there were facts disputing the defendant’s evidence.
During the trial, pictures of the interior of the apartment were introduced, showing the bed, desk, drinking glass, white gloves, barrette, ruffled spot on the bed, hole in the ceiling, blood on the floor near the bed and near the back wall, as well as out toward the door, the doctor’s body, and all physical evidence in the bedroom. There is nothing in any of the pictures to contradict what the defendant said. The evidence showed that blood from the doctor splashed on her shoes and stockings, and the picture showed blood on the floor, where she claimed the shooting occurred, and the gun on the floor where she said she dropped it.
At the conclusion of the evidence, the learned trial judge sustained a motion to exclude the evidence insofar as murder was concerned, holding that there was not sufficient evidence to submit that issue to the jury.
The State asserts that the jury was warranted in believing the appellant’s version of the homicide was unreasonable and unbelievable because: There was evidence of ill treatment, quarrels and threats between appellant and Dr. Ringold, and the State says this evidence that the accused had previously quarreled with and threatened her husband with whose murder she was charged was competent to show malice, citing 3 P. Herrick, Underhill’s Criminal Evidence 1545 (5th ed.1957). It argues that this evidence was also admissible to show motive. However, the lower court found the evidence was not sufficient to submit to the jury the question of murder, so that there could be no prior motive applicable here. Furthermore, if it can be said threats and acts of violence were admissible because the question of who was the aggressor might be in doubt or in a state of confusion, Hendrix v. State, 172 Miss. 589, 161 So. 151 (1935) ; Clark v. State, 123 Miss. 147, 85 So. 188 (1920), there was also evidence of, assault and extreme violence on the part of the deceased toward the appellant so that the evidence as to occurrences previous to the shooting which might be thought to determine who was the aggressor could be as well applied to one as the other. In other words, the evidence on this point is balanced. It was shown that the doctor, three or four months prior, had struck the defendant, knocked her down, and as a result thereof her pelvis was fractured. She was forced to go to the hospital and was incapacitated thereby. Furthermore, there was no evidence placing the issue of who was the aggressor in doubt or confusion.
The second point made by the state is that at one time, according to the record, Dr. Ringold made an improper advance toward the retarded daughter of appellant and she might have held resentment. The testimony showed and is undisputed that she had forgiven him, and there is no evidence to the contrary, and, if there were, it would be the same attitude as the first question regarding motive. The court having held that the testimony was insufficient *449 to submit to the jury the charge of murder, the question of motive is eliminated and to say that she was still resentful toward him is to completely disregard the undisputed testimony as to their pleasant evenings together since the divorce, her cooking squirrels for him and her offer to mend his coats.
The third question raised by the State is that the evidence showed Dr. Ringold was in poor health because of his sixty-one years of age, his drinking habits, and because he had had cataracts recently removed. Also, he had a trick knee and had lost weight. The record shows beyond doubt that he had had the cataract operation and that thereby his vision was limited but this fact itself corroborates the defendant. She testified that as he walked across the floor of the living room he tripped over the gun. She, herself, told of his tripping over the shotgun and this part of her testimony, as stated, is corroborated by the fact that he did have a cataract operation.
On the fourth point, the State raised a question about the shotgun and said the doctor previously had been an avid hunter, but had been dove hunting only once recently. The position taken by the State in the first part of the trial was that the doctor had quit hunting altogether two years before, but the defendant placed on the stand witnesses who testified that they had been hunting with him the fall of his death. As far as being familiar with the operation of the shotgun, it was shown that some of the officers, including the district attorney, were not familiar with it, and did not believe it operated as proof showed until the gun was carried out and shot to demonstrate it did operate as she had testified, or that it would fire on being pumped without having to again release any guard. It is true the proof shows there were three shells in the shotgun when she took it to Dr. Ringold’s apartment and the sheriff testified that when he examined the home of appellant he found a box of similar shells with twenty-two still therein. The defendant explained that when she and her daughter left the home of Dr. Ringold and moved into a place of their own she had some shells and loaded the gun with three of them necessarily leaving twenty-two shells.in the box. So there is no dispute between her evidence and what the sheriff said about the shells.
The fifth ground states that the jury was warranted in drawing an inference unfavorable to appellant because the officers at Cleveland could find no fingerprints on the shotgun. It was not shown that these officers were experienced in trying to get fingerprints and the chief investigators for the highway department testified if it had been given to them they would have sent it to Jackson to the headquarters to be examined for fingerprints. However, this matter is inconsequential because the defendant admitted she had the gun, and that it was she who shot the doctor. In fact, the sheriff testified she called him that morning to tell him she had shot the doctor.
The sixth point is that the testimony is inconsistent with the theory of self-defense because when asked by counsel if she intended to have the gun discharge that she said, “I was trying to frighten Dr. Ringold. I was frightened and I was afraid of him.” And then when asked if she knew whether or not she would have killed him if it had not gone off then, if he had kept coming, her reply was, “I don’t know. A person that was in the position that I was at that time — I don’t know.” We do not regard this as material.
In the seventh point by the State it claimed that since the witness Fuccie testified that when she, the witness, came to her house which was across the street from where defendant lived, around one or two o’clock in the morning she saw a white car and a dark car at the garage of Mrs. Wilson. She did not know whose cars they were, and she could not say it was Mrs. Wilson’s car, or just whose cars they were.
It is argued from this the jury might believe the defendant left the apartment after the shooting, went to her home and *450 talked to her sister, Mrs. Thornton, who had a white car. Dr. Ringold’s partner came soon after the shooting and said he stayed for an hour and Mrs. Wilson never left. There is also evidence as to the psychogenic shock under which it might have been possible for Mrs. Wilson to have gone to her home and returned in the time she was blacked out, as to which we do not know, but at least this was after the shooting and could have no material effect on the facts regarding the shooting.
On the other hand, the appellant in order to substantiate her claim that her testimony is reasonable and substantially uncontra-dicted in material particulars by any witnesses, the physical facts, or facts of common knowledge, cites the following:
There is no evidence to contradict her statement that she received a telephone call from Dr. Ringold about 8:30 or 9:00 p. m. in which he asked her to come to his apartment for dinner and to bring her drink with her. She did bring the drink in her own glass, with part of a paper towel wrapped about it. The glass was introduced in evidence. The sheriff took the piece of paper towel that was around the glass, carried it to the home of Mrs. Wilson, and there matched it with the roll of paper towels from which it had been torn. Next, her testimony about having dinner with Dr. Ringold on Monday night and Tuesday night was completely uncontra-dicted, and there is no evidence of any unpleasantness on either of said occasions.
She said she came to the apartment, entered with her drink and purse forgetting the gun. Later she returned to her car, got the shotgun, and brought it into the apartment after the doctor had reminded her by asking whether she forgot it. This testimony was corroborated by a witness by the name of Louis Millen who saw a woman walking north along the sidewalk in front of the apartment at a time when she had nothing in her hand and after Millen parked his car to the south of the building he saw a woman come around the building with a shotgun in her hands carrying the gun in a casual fashion. The lady went to an apartment one door north of the apartment of one Hunter Bell, which was the apartment of Dr. Ringold.
Mrs. Wilson testified that she had a drink or two of Scotch whisky while she was in the doctor’s apartment and that the doctor was drinking bourbon. The whisky bottles found by the highway patrolman investigator verified this in detail. She said that when she arrived Dr. Ringold was shredding lettuce for a salad. The patrolman investigator, Mr. Pressgrove, found a white napkin in the apartment with lipstick stain on it and a green-type substance apparently from a salad or lettuce. This could have been easily contradicted, had it not been true, by showing there was no green salad in the apartment on the morning after the shooting. Mrs. Wilson testified she and the doctor had “tacos” for dinner that evening. The patrolman investigator found a tacos box in the waste basket in the kitchen, which box was introduced into evidence. She testified Dr. Ringold got a telephone call about 11:00 p. m. on the night of November 18. The State’s witness, Miss Sue Ivy, testified she called Dr. Ringold’s apartment about that time, that he answered the telephone and she asked him to come to see Maxine Harper. Mrs. Wilson testified that the doctor told her he had to make a call, for her to wait for him, and he left the apartment. The State’s witness, Maxine Harper, swore that Dr. Ringold came by to see her in response to the call of Sue Ivy; that he gave her attention and left about 11:15 p. m. Mrs. Wilson testified that she went into the bedroom, curled up near the head of the bed and went to sleep after Dr. Ringold left. This is corroborated by the pictures introduced. Mrs. Wilson testified she brought her drink into the bedroom with her and placed it on the desk at the time she laid down. This is also corroborated by the pictures.
Appellant said the decedent returned to the apartment about 2:10 or 2:15 a. m. *451 after making the 11:00 call. Mr. Paul Bennett, a state witness, lived just below the apartments. He said sometime after 11:00 p. m. Dr. Ringold stopped his car in front of his (Bennett’s) home, about twenty-five feet from the witness and the doctor was still there when the witness retired about 12:00 midnight. He did not know how long the doctor remained there. He had never seen him park there previously but the car was there the next morning. Mr. Bennett said the doctor was in the driver’s seat with his head down — his head was nodding, looking downward. The doctor was still there after the witness had turned off the television and had gone to bed. He got up once and saw the doctor was still there.
Mrs. Wilson testified that Dr. Ringold had given her the white gloves previously left in his apartment and that they were placed on the desk by the bed. This is corroborated by the pictures. She testified that when she laid down she removed her barrette from her hair. Investigator Pressgrove testified that he found the barrette on the desk by the bed in the south bedroom.
Mrs. Wilson testified that she was backed up as far as she could go with the doctor coming toward her at the time he struck the gun and knocked it up and caused it to discharge.
The sheriff testified the hole in the ceiling appeared to be made by someone standing between the night table and the bed at the time the gun was fired. Other witnesses testified to the same thing. •
Mrs. Wilson testified the doctor was advancing on her and she pushed him back and pumped the gun at the time of the second shot which killed the doctor. The picture which shows the blood which ran from the doctor’s chest immediately after he was shot corroborated her statement that he was close to her. The investigator testified there were blood stains on Mrs. Wilson’s stockings and shoes which indicate the doctor was close upon her at the time he was shot. She testified that after the shot was fired she dropped the gun on the floor. The pictures verify this statement by showing the gun was on the floor. She said that Dr. Ringold came into the apartment and awaked her about 2:10 or 2:15 a. m. and was shot shortly thereafter. This was verified by the testimony of Dr. Fitzgerald, Dr. Ringold’s partner, who arrived about 3:15 a. m. and stated that Dr.. Ringold had been dead for a period of one or two hours.
Mrs. Wilson further testified that she blacked out after the shot was fired. The testimony of Dr. Milam and his affidavit showed that she was suffering from shock and had an accelerated pulse, and elevated blood pressure with palpitation when he examined her around 4:30 a. m. The testimony of Dr. Bobo was that in his opinion Mrs. Wilson was suffering from psychogenic shock which did cause black out. Mrs. Wilson said when she regained consciousness she called the sheriff and her sister, which evidence was verified by the sheriff. She testified that she was in fear of Dr. Ringold and said his mood, manner, and appearance was parallel to that of August 2, 1965, at which time he had struck her in the face, knocked her down and fractured her pelvis. This statement was verified by the testimony of Martin King and Dr. Lindsey. It appeared that he had been drinking.
The circuit judge thought the testimony by Mrs. Wilson was sufficiently reasonable and uncontradicted to prevent submitting to the jury the charge of murder and, as we see it, it did not make a jury question on manslaughter. Aven v. State, 246 Miss. 839, 152 So.2d 924 (1963) ; Lomax v. State, 205 Miss. 635, 39 So.2d 267 (1949); Westbrook v. State, 202 Miss. 426, 32 So.2d 251 (1947) ; Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).
This is a sad and tragic case where a good man and one that had and could have been of service to his community died *452 too soon, but, under the proof here before us, we cannot say there was sufficient evidence to submit the charge of manslaughter to the jury. We are compelled therefore to reverse the case and discharge the defendant.
Reversed and defendant discharged.
ETHRIDGE, C. J., and PATTERSON, INZER, and ROBERTSON, JJ., concur.