240 So.2d 611 (1970)
Herman CHILDS
v.
STATE of Mississippi.
No. 45953.
Supreme Court of Mississippi.
November 2, 1970.
*612 John B. Farese, Ashland, Robert W. Elliott, Ripley, Peggy A. Jones, Ashland, for appellant.
A.F. Summer, Atty. Gen., by Timmie Hancock, Sp. Asst. Atty. Gen., Jackson, for appellee.
SMITH, Justice.
At the January 1968 Term of the Circuit Court of Tippah County the grand jury indicted Herman Childs for murder in connection with the fatal shooting of one Bobby Willingham. Upon his first trial under the indictment, the jury was unable to arrive at a verdict and a mistrial was entered. At a subsequent term, Childs was again placed on trial and a verdict of guilty of manslaughter was returned, the validity of which is seriously challenged upon this appeal. A sentence of 20 years in the penitentiary was imposed by the trial court. Childs appeals from that conviction and sentence.
A number of grounds are assigned for reversal. It is argued with great earnestness that appellant was entitled to a directed verdict of not guilty under the "Weathersby rule," the name deriving from the decision in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).
In Weathersby, the Court stated that it is the established rule in this state that:
[W]here the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by facts of common knowledge. (Id. at 209, 147 So. 482).
The most recent application of the rule appears in Cassidy v. State, 233 So.2d 122 (Miss. 1970), where the authorities were again reviewed. The rule is of ancient origin, and has been followed in a long line of cases. The reasons which support it were clearly stated in the early case of Hawthorne v. State, 58 Miss. 778 (1881) where the Court said:
"The law presumes the accused to be innocent of the crime charged, until the contrary is made to appear; but when it is shown that he killed the deceased with a deadly weapon, the general presumption of innocence yields to the specific proof of such homicide, and the law infers that it was malicious, and therefore murder, because as a rule, it is unlawful to kill a human being, and is murder if not something else; and as special circumstances only will vary the legal view of homicide so as to relieve it from the character of murder, it is inferred or presumed to be such from the fact of killing unexplained; but if the attendant circumstances are shown in evidence, whether on the part of the State or the accused, the character of the killing is to be determined by considering them, and it is then not a matter for presumption which operates in the absence of explanatory evidence, but for determination from the circumstances shown in evidence. * * *" "(58 Miss. at 787)." (233 So.2d at 124).
In the case now before us appellant is the only surviving eye witness.
A summary of the circumstances in evidence relating to the homicide follows.
Childs and his wife lived in a trailer home located some distance from the Town of Ripley in Tippah County. On March 3, 1967, the day of the shooting, Childs was 53 years of age and ill. At about 10:30 o'clock on that morning, Childs and his wife were at home alone, and Childs was lying down on a couch in the living room, taking a nap. Willingham, for the killing of whom Childs was convicted, and two others, Jodie Booker and Buddy Pannell, arrived at the trailer. They came in and sat down upon the couch. They had been drinking prior to their arrival and had with them a bottle of gin from which they continued to drink. Childs was offered and took one drink of the gin. It appears that they *613 had come because Booker wanted Childs to let him have $20, either by cashing a check or as a loan. Childs was unable to find a blank check so he lent Booker the money. This money he took from a roll of bills amounting to several hundred dollars.
When these men arrived at the Childs' home, Childs' loaded revolver was lying on a shelf formed by the top of the back of the living room couch and the north wall.
Booker, who was drunk, left the trailer first and Childs followed him outside, calling to Pannell and Willingham to suggest that they go with Booker who was in no condition to drive. Pannell and Willingham came out of the trailer and left with Booker, the remark being made at the time that they were going to Tom Wier Mitchell's Place to get a drink. After they had departed, Childs and his wife began cleaning the ash trays in the living room and it was then discovered that Childs' revolver was missing from the shelf. A search was made but the pistol could not be found. Other than Childs and his wife, no one had been in the trailer save Willingham, Pannell and Booker.
After lunch, Childs continuing to feel unwell, again lay down to sleep on the living room couch.
That afternoon, Childs was awakened by the sound of an approaching vehicle. Shortly, Willingham and Pannell came into the trailer without knocking. They were in an "unfriendly" mood. Pannell sat on the west end of the couch and Willingham on the east and Childs sat down in a small chair near (about 8 inches from) the front door of the trailer. The object of this visit by Willingham and Pannell is unknown.
The record contains a minute description of the Childs' living room and of the disposition of the furniture. It appears from the evidence that this room was only 7 1/2 feet wide east and west and about 12 feet long north and south. The chair in which Childs was seated was in the southeast corner, next to the door, in front of a heater and television set. Two inches above the door, which was 5 feet 10 inches in height, resting on 2 straight wooden pegs, Childs kept a loaded 30 caliber carbine. Along the north wall was the couch on which Willingham and Pannell were sitting. This extended all the way across the width of the room and protruded south into the room about 3 feet. The top of the couch back formed the shelf from which the pistol was missing. There was a chair about 12 or 15 inches south of the couch and some 3 feet east of the west wall. Immediately south of this chair and resting against it there was a table which extended about 3 feet east from the west wall. Obviously, the number of pieces and the arrangement of this furniture in the tiny living room left very little open space.
Pannell and Willingham had been drinking and continued to drink from a bottle of gin that they had brought with them. Childs asked them about his missing revolver, the disappearance of which he had discovered following their departure that morning. Neither Pannell nor Willingham made any response to this inquiry. Childs then said to them that his pistol had been on the couch shelf that morning when they had come in. Willingham spoke up and said that Booker had taken the gun. Childs expressed doubt that this was so, saying "Fellows, I can't believe Mr. Booker would steal my gun. * * * In the first place he was too drunk, and * * * I don't think he's that kind of man." Willingham then wanted to know if Childs was accusing them of lying. Childs responded by repeating his statement that he did not believe Booker had stolen the pistol. Willingham then demanded "Are you accusing us of stealing it?" Childs responded that all he knew was that it had been on the couch shelf when they had come in that morning and that it was gone. Until that time, Pannell, apparently had not entered into the conversation about the missing pistol. Now he spoke up and admitted that they had taken Childs' gun. He accompanied this admission by telling Childs that he was going to blow his head off and began *614 to draw the gun. When Childs saw Pannell drawing the pistol he grabbed the carbine from the pegs above his head, stepped to the left and fired several shots at Pannell, a number of which took effect. Pannell dropped the revolver which fell on the floor in front of the couch on which he and Willingham were sitting. Willingham cursed Childs, reached for the pistol, and Childs then shot him. Each of these men was shot a number of times, the carbine having been of the semiautomatic type, capable of discharging its clip of cartridges in a very few seconds.
Childs' wife, who was in the bedroom and did not actually witness the shooting, entered the living room immediately afterward. Childs told his wife that he had been compelled to shoot Willingham and Pannell in self-defense and instructed her to "call the law." This she did. Meanwhile, Childs picked up the pistol, moved the bodies back on the couch and awaited the arrival of the officer.
The witnesses who testified for the prosecution were the woman whose telephone Mrs. Childs used to call the constable, the constable who responded to the call and arrested Childs, an undertaker, a highway patrolman and the sheriff of Tippah County. We have read and reread with the utmost care the record of the testimony of all of these witnesses and have studied the recital of the evidence as set out in the brief filed on behalf of the State of Mississippi. Nothing whatever in the testimony of these witnesses "substantially contradicts (Childs) in material particulars" unless it is an opinion which the sheriff was allowed to express, based upon an assumption that he was an expert on the subject, to the effect that the shots fired by Childs had come from the southwest part of the trailer. Childs had testified, as already noted, that he had been sitting in a chair in front of a heater and a television set located in the southeast part of the living room, that when Pannell began drawing the pistol he had grabbed the carbine from above the door, stepped to his left (to the west) and fired.
This testimony of the sheriff is attacked upon several grounds. First, it is argued that his entry of the Childs' home was an unconstitutionally unreasonable search and that all of his testimony therefore was inadmissible, second, that allowing him to give his opinion as an expert invaded the province of the jury, and was error, and third, that his testimony, if admissible at all, should have been limited to a description of the physical facts he had actually observed. Moreover, it is contended that his opinion, even if properly admitted, did not substantially contradict Childs' statement in any material respect.
We agree that the sheriff should have confined his testimony to a statement of facts known to him, and that he should not have been allowed to express an opinion as an expert. Cobb v. State, 226 Miss. 181, 83 So.2d 833 (1955); Harris v. Pounds, 185 Miss. 688, 187 So. 891 (1939); Temple v. State, 105 Miss. 449, 62 So. 429 (1913); and, Foster v. State, 70 Miss. 755, 12 So. 822 (1893).
It is argued on behalf of the State, however, that, even if error, the admission of the sheriff's opinion should be considered harmless error.
If it may be conceded that it was harmless error to admit the sheriff's opinion (and we do not so decide) the question would remain, did it constitute a substantial contradiction of Childs' version of the affair in some material respect?
In the State's brief, attention is drawn to the fact that "the entire transaction occurred within an open space only 4 by 4 1/2 feet." This is supported by the record as to the dimensions of the living room and the arrangement and size of the several pieces of furniture which it contained. The sheriff said that he had based his opinion on certain bullet holes and the "empties," meaning the brass shells ejected from the right side of the rifle as it fired, but admitted on cross-examination that the position of the latter was as consistent with appellant's testimony that he had been about *615 3 feet to the left or west of his original position when he had fired as that he had been the entire available 4 feet west of it. It is, of course, undisputed that when Childs seized the rifle from above the door he had stepped to his left (to the west) to fire.
It was error to allow the sheriff to give his opinion as an expert. But the decisive point is that his opinion was not so inconsistent with the testimony of Childs as to his position in the 4 by 4 1/2 foot space as to constitute a substantial contradiction with respect to a material matter within the meaning of Weathersby. Childs' version of the occurrence is not so intrinsically unreasonable as to require its rejection in the absence of countervailing evidence, nor is it inconsistent with the physical facts in evidence or with matters of common knowledge.
It may be well to notice that no motive for the shooting is suggested save that testified to by Childs, that is to say, that he had fired in necessary self-defense. Childs was in his own home, ill and lying down, when these men, who had already stolen his pistol, sought him out again. They were under the influence of intoxicants and knew, as the result of their earlier visit, that he had a considerable sum of money. At the time of the shooting Willingham and Pannell not only had been drinking intoxicants all day long but were still drinking. They were in a hostile mood on their return visit and became very angry when questioned about the pistol stolen earlier. They had made threats against Childs on a former occasion (although it does not appear that these had been communicated to Childs), and Willingham's reputation for peace or violence was shown to be bad. There was evidence that Childs had been ambushed by unknown assailants and had been seriously wounded three years previously when he was at a spring which supplied his home with water. It also appears that Willingham and Pannell had said, in a crap game in which they had been engaged, that it had been they who had shot Childs at the spring and that "next time" they were going to kill him. It does not appear that Childs had known this previously.
It is unnecessary to reach the constitutional question as to the legality of the sheriff's search, the contention that there had been a lack of unanimity in the verdict, or any of the numerous other grounds for reversal assigned and argued by appellant, as we are forced to conclude that appellant's request at the conclusion of the evidence that the jury be peremptorily instructed to find him not guilty should have been granted under the Weathersby rule. It is necessary, therefore, that the judgment of conviction be reversed and the appellant discharged.
Reversed and appellant discharged.
ETHRIDGE, C.J., and PATTERSON, INZER and ROBERTSON, JJ., concur.