404 So.2d 1386 (1981)
Phillip CLINGAN
v.
STATE of Mississippi.
No. 52880.
Supreme Court of Mississippi.
October 21, 1981.
Michael G. Thorne, Tupelo, for appellant.
Bill Allain, Atty. Gen. by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and WALKER and BOWLING, JJ.
*1387 BOWLING, Justice, for the Court:
Appellant was indicted in the Circuit Court of Lee County for the crime of murder. The jury returned a verdict of manslaughter and appellant was sentenced to serve a term of twenty years with the Mississippi Department of Corrections. The conviction was for the death of his wife Elizabeth Clingan. Appellant on this appeal assigns two errors; namely:
I. THE COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR A DIRECTED VERDICT TO WHICH THE APPELLANT WAS ENTITLED UNDER THE "WEATHERSBY RULE."
II. THE COURT ERRED IN RULING THAT THE TESTIMONY OF THE EXPERT WITNESS A QUALIFIED PSYCHIATRIST, TO SHOW THE STATE OF MIND AND THE PROBABILITY OF PSYCHOGENIC SHOCK OF THE APPELLANT AFTER THE DEATH OF THE VICTIM COULD NOT BE ADMITTED INTO EVIDENCE.
Appellant and his deceased wife had been married approximately seven years prior to her death on Sunday, April 28, 1980. They had one small child. Most of the facts surrounding the relationship of the Clingans is undisputed and most of the facts surrounding the death of Mrs. Clingan and subsequent events were supplied by appellant. Sometime prior to Mrs. Clingan's death, she correctly suspicioned that appellant was seeing another woman. For several weeks prior to her death Mrs. Clingan had been staying at her mother's home with her child. She and appellant were keeping in contact in an effort toward reconciliation. On April 28, 1980, the deceased went to the home of the parties at about 11:30 a.m. and stayed until about 2 p.m. During this time the couple had marital relations. Appellant at the trial related what occurred after his wife departed the home.
Appellant received a telephone call from his girlfriend requesting that he go for a ride. Appellant agreed and they met at a convenience store parking lot. Appellant parked his car, got in the car with his girlfriend, and they rode to a lake and returned. During the course of this ride, appellant and his girlfriend together smoked one marijuana cigarette.
In the meantime, Mrs. Clingan had seen her husband's car and was waiting for him to return. Upon driving toward his car, appellant saw Mrs. Clingan and had his girlfriend drive him to another friend's house who returned appellant to his car. The deceased was not there at that time.
Appellant then went to the apartment where they lived, and upon entering, found *1388 his wife standing there with a shotgun. Appellant grabbed the barrel of the gun and took it away from his wife, pushing her to the floor on her back. Appellant had full control of the gun. Appellant testified he began to lecture his wife about gun safety and pointing a gun at someone. In the meantime the deceased had retreated to the first and second steps of the stairway leading to the second floor of the apartment. Appellant testified his wife then grabbed the gun barrel and pulled it down and since the safety was off the gun, his finger struck the trigger causing the fatal shot. According to the pathologist, the shot entered the body of the deceased at the lower part of the neck and traveled downward at about a 45 degree angle. He could not tell whether the barrel of the gun was very close to the deceased or three or four feet away. The deceased fell, according to appellant, and in falling turned around and landed on her back, just at the foot of the stairway. He determined that she was dead.
Appellant testified he sat on the stairway and cried for some two to three hours. He then went to the home of his mother-in-law to visit his son for a very short time and returned to the apartment. According to him, he sat on the couch trying to think. He called his mother-in-law and asked her to put the child to bed as his wife had gone to get supper and would return home later. Appellant testified he spent the night on the couch in the same room where his wife's body was lying.
The next morning appellant called the bank where his wife worked and advised them that she would not be at work that day. He also attempted to persuade the deceased's brother to make excuses to his mother as to why the deceased would not meet her for lunch. He then sat around the apartment until noon, after which he covered his wife's body with a blanket, so that he would not have to keep looking at her. He then called his girlfriend and asked her to come get him so that they could drive around and get something to eat.
After he was taken back to the apartment, he sat around some more. He then made an effort, according to him, to get drunk. His liquor supply was not sufficient, so he started to the liquor store for some more whiskey and ran out of gas. He called his girlfriend to bring him some gas, which she did. While gasoline was being put in appellant's car, his wife's brother came by and asked him if he had seen his sister. Appellant told the brother-in-law that he had not seen her.
On neither occasion with this girlfriend after his wife's death did he mention this fact to her.
Later that evening the appellant's brother-in-law, Richard, came to appellant's apartment, knocked on the door and hollered but received no response. He then went to the back door where again he received no response. Being suspicious that something was wrong, the brother-in-law took out a window pane and entered the back door. Upon entering the apartment, he was met by appellant with a gun.
After discussing the situation, appellant placed the gun on the floor. At that time the appellant told Richard his sister had killed herself. The brother-in-law, after taking the telephone off the wall, went to another house and called the police. The police arrived shortly thereafter and discovered the body of deceased.
After his brother-in-law left appellant testified he took the gun and drove to Alabama where he stopped on the Buttahatchie River Bridge, destroyed the gun, and threw the remains into the river. Appellant then drove to Plantersville where he briefly visited a friend, then drove up the Natchez Trace, and returned to Tupelo where he spent the night in a motel. The next day he went to Birmingham, Alabama.
Appellant stayed in Birmingham two weeks without letting anyone in Mississippi know where he was. Appellant took a bus back to Tupelo and went to his mother's trailer home near Tupelo. He was informed by his mother that her home was being watched by law enforcement officials. Appellant went to the woods and spent the night there. The next day he caught a ride to Memphis, Tennessee. The day after that he called his mother and told her he would *1389 give himself up to the police chief, if he would meet him. The two met at the Tennessee-Mississippi line, where the police chief took appellant into custody.
Appellant's testimony was that he was an experienced handler of guns and had taught his wife how to handle firearms. The gun in question is what is known as a "pump" .12 gauge gun. It was appellant's testimony that after he took the gun from his wife, she told him it was unloaded, although appellant's testimony was he kept it loaded at the apartment.

DID THE COURT ERR IN REFUSING A DIRECTED VERDICT UNDER THE 
WEATHERSBY RULE?
There have been many cases regarding the defense of the so-called "Weathersby Rule." This was set out in Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), where the Court, through Justice Griffith, stated that:
[W]here defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
(165 Miss. at 209, 147 So. at 482).
As stated, the principle of the Weathersby Rule requires that if it is applicable, it is a question of law for the trial judge to decide; and if applicable, it is his duty to direct a verdict of acquittal. There have been many cases interpreting the non-applicability of the rule under the latter part of the above quote which states, "unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge."
At the outset, appellant relies primarily on the cases of Dew v. State, 309 So.2d 857 (Miss. 1975); Childs v. State, 240 So.2d 611 (Miss. 1970); and Wilson v. State, 199 So.2d 445 (Miss. 1967). A reading of those cases shows they have no application to the above set out facts and the undisputed testimony of appellant. In Dew the Court in reversing and discharging the appellant said:
The appellant's testimony, as we review it, is not controverted in its material particulars by either the physical facts or those of common knowledge. The contradictions, if there be such, are related to slight discrepancies regarding the time the appellant returned from riding around with Vaughn or the reputation of the defendant. Numerous witnesses testified that defendant's reputation for peace and violence was very good, but this was disputed on rebuttal by the mother of Mrs. Dew who, after acknowledging that the defendant loved his wife, gave evidence that he had nevertheless months before struck her, leaving bruises upon her body.
The remaining issue is whether the defendant's version of the affray is reasonable. The path of the bullet from its entry point behind the left shoulder to the twelfth vertebra corroborates the appellant's testimony that his wife was somewhat below him when the shot was fired. The bruise upon the left knee of Mrs. Dew is not inconsistent with the appellant's testimony that the shot was fired from above her body. The absence of powder burns is explained we think, or at least is not unreasonable, when thought is given to the fact that the extended arm of the normal adult is around two feet or more, the critical distance, according to the pathologist for the presence of powder burns.
An examination of the weapon shows that when it is held in a normal position and the hammer pulled back, the side safety latch, which is loose, will move into a firing position and the hammer will fall by a pull of the trigger whether or not the handle is squeezed. The examination also reveals that the hammer will fall when the trigger is pulled when the safety latch is removed from the gun, again without pressure being applied to the "lemon squeezer" of the handle. These factors negate the testimony or inference therefrom that a deliberate activation of the side safety latch and the "lemon *1390 squeezer" was necessary to fire the gun. This, in our opinion, lends a degree of authenticity to the defendant's version of the occurrence which, when considered in its entirety, is not unreasonable though, tragic.
(309 So.2d at 859).
In Childs, supra, the Court reiterated its statement in Dew.
In Wilson, supra, the appellant shot her former husband in the bedroom, according to her in self defense. She immediately blacked out and was taken to a hospital. The Court in reversing and discharging Wilson said that there were no circumstances or physical facts that would in any way dispute the positive testimony of Mrs. Wilson.
In the case sub judice, we have an entirely different situation from the facts of the cases relied on by appellant. Although appellant had smoked marijuana not long before his wife's death and according to him was extremely upset after the death and undeniably so, he had the presence of mind to go to his mother-in-law's home and then later tell her an untruth as to the whereabouts of his wife. He had the presence of mind to call his wife's employer the following morning, and also contact his brother-in-law in an attempt to cover-up further. He made at least two trips with his girlfriend without divulging the situation of his wife's death to her. Upon his brother-in-law finding out about his wife's death, he immediately took the gun and left the apartment, spending the night at a motel in Tupelo, but not before he destroyed the gun and disposed of it. He spent two weeks in Birmingham before attempting to go to his mother's home. He had the presence of mind to spend the night in the woods rather than face law enforcement officials and then go to Memphis.
This Court has held in several cases that flight is evidence to be considered by the jury on the question of guilt. McElwee v. State, 255 So.2d 669 (Miss. 1971); Burkhalter v. State, 302 So.2d 503 (Miss. 1974); Johnson v. State, 346 So.2d 927 (Miss. 1977); and Griffin v. State, 292 So.2d 159 (Miss. 1974). In McElwee, supra, the appellant relied on the Weathersby rule in contending that he was entitled to acquittal. This Court in holding that the Weathersby rule did not apply said:
It is true that appellant was the only eye witness to the shooting, but his own voluntary statement to the sheriff and the investigator to some extent contradicted his testimony given at the trial. These contradictions together with the fact that appellant immediately left the scene and never reported the incident to the sheriff or any one else, were sufficient to take the case out of the Weathersby rule.
(255 So.2d at 671).
In analyzing the evidence shown in this record and the testimony of appellant, he not only fled, but before doing so, deliberately told untruths and misled several people regarding the whereabouts of his wife, whom he knew all the time was still lying dead on the floor. During all this time, he had ample occasion to report an "accident" before fleeing for more than two weeks. It is obvious, therefore, that under the above set out authorities, the admitted actions of appellant were evidence to be considered by the jury on the question of guilt or innocence and the Weathersby rule does not apply.
Furthermore, appellant emphasized that he was a gun expert. Still, after he took the loaded gun from his wife, pushed her to the floor on her back, and she was going to the stairs, he did not ascertain the safety latch of the gun was in the "on" position. He left it so that it would fire. This surely was a fact that could have been considered by the jury.
We, therefore, hold that the Weathersby rule does not apply in this case and appellant was not entitled to a directed verdict for that reason.

DID THE COURT ERR IN NOT ALLOWING THE TESTIMONY OF THE PSYCHIATRIST REGARDING THE PROBABILITY OF PSYCHOGENIC SHOCK TO APPELLANT?
Appellant offered the testimony of Dr. Jan T. Goff, a psychiatrist, who testified out of the presence of the jury regarding *1391 his answer to a hypothetical question. The appellant's attorney propounded the hypothetical question to Dr. Goff, which we will not repeat here except to say that it did not include all of the undisputed evidence in the case and was therefore not a proper hypothetical question.
We do not have to pass on the hypothetical question in order to agree with the lower court that the exclusion of Dr. Goff's testimony from the jury was proper. The lower court in denying Dr. Goff's testimony stated that the testimony regarding so-called "psychogenic shock" was not of sufficient probative value in this particular case and that there was no basis in the evidence for such testimony. One of the principal reasons for this decision by the lower court was that when the witness was asked if the behavior of the appellant as described by the doctor was indicative of guilt, he said "no." When asked if it was indicative of a lack of guilt the answer was, "No, it would have no predictive value in saying whether he wanted to murder his wife or not." When asked if his testimony would aid in determining whether or not the death of the deceased was accidental, the doctor's answer was, "Oh, it doesn't help you there at all."
It is inescapable that the trial court was entirely correct in refusing to allow Dr. Goff's testimony to be heard by the jury.
We therefore find no reversible error in the cause, but on the other hand, find there was ample evidence for the jury to convict appellant of manslaughter, rather than murder for which he was indicted.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and HAWKINS, JJ., concur.