493 So.2d 365 (1986)
Roger Lynn HARVESTON
v.
STATE of Mississippi.
No. 56376.
Supreme Court of Mississippi.
August 20, 1986.
*366 William D. Boerner, Robert D. Underwood, Boerner & Underwood, Brookhaven, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Today's twenty-two year old Appellant seeks relief from his life sentence imposed following his conviction of murder. No difficult or novel questions of law are presented. Rather, the case serves to remind us of the awesome responsibility shouldered by those oft-maligned citizens, our jurors.
Twelve Lincoln County jurors who could not know what really happened were asked to sort out an exclusive tale of death and heavy drinking and alleged homosexuality. No doubt they, as we, were aware of the enormity of the impact on the accused of a mistaken verdict. The jury convicted. A faithful application of our law, attended by respect and humility, requires that we affirm.

II.

A.
On July 7, 1984, Roger Lynn Harveston, Defendant below and Appellant here, went to the Sunset Bar in Pike County, Mississippi, with his friends, Keith Durr and Timothy Waldrop. The three played pool and drank beer and remained at the Sunset until it closed about 12:00 midnight. The trio then left and went to the Panama Limited Lounge in McComb, Mississippi. Upon entering the Panama, Harveston was given a black mark on the back of his hand, indicating he could not be served mixed alcoholic drinks. Harveston was 20 years old at the time.
Around 3:00 a.m. on July 8, 1984, David Myers, manager of the Panama Limited Lounge, observed Harveston drinking out of Keith Durr's mixed drink. Because he had violated the rules of the lounge, Harveston was asked to leave. Harveston requested permission to stay, promising not to drink any alcoholic beverages on the premises again. Myers explained the lounge policy which prevented Harveston from returning to the lounge on the same night in which he had been caught violating the rules. Harveston left without protest and his friends remained behind.
Charles Barron, an employee of Yesterday's Restaurant (located in the same building complex as the Panama Limited Lounge), had stopped by the Panama after finishing work. Barron encountered Harveston outside the lounge and offered *367 to take him home to Brookhaven. At the time Barron was 55 years old, of stocky build  six foot tall and weighs 180 pounds. Roger Harveston was then 20 years old, of slight build  5'4 and weighed 130 pounds. The two left the lounge with Barron driving his late model maroon Oldsmobile.
At some point thereafter Keith Durr and Tim Waldrop finished their drinks and began searching outside for Harveston but were unable to locate him. Durr and Waldrop then decided to return to Brookhaven in Durr's pickup truck. Because Durr had had too much to drink, Waldrop took over driving in Summit.
While driving along the Old Wesson Road, Waldrop saw a car coming up behind him "real fast". The car, an Oldsmobile, passed Durr and Waldrop and took a fork in the road going toward Harveston's and Waldrop's house. When Waldrop got to the top of the hill, he noticed the car coming back toward him again and he (Waldrop) pulled into Charles Wallace's trailer. The car also pulled into Wallace's trailer and at that time Waldrop realized that Roger Harveston was driving it. Both vehicles were stopped. Waldrop got out and walked over to the vehicle Harveston was driving and noticed a man, later identified as Charles Barron, lying face down on the passenger side of the car. The man was lying still. Waldrop noticed a handgun on the front seat of the car and recognized it as belonging to Harveston.
Moments later Waldrop saw a police car approaching, and Waldrop turned and ran. Officer Bobby Bell of the Brookhaven Police Department was driving the car. The time was 4:40 a.m., and he was in the process of investigating a loud noise complaint. As Bell approached he saw Harveston standing by the car. He also noticed Waldrop running away from the Oldsmobile.
When Officer Bell arrived at Charles Wallace's trailer he noticed that a black pickup truck and a 1983 Oldsmobile were parked there. Waldrop had run behind the trailer. Harveston, who had gotten out of the maroon Oldsmobile he was driving, went over to talk with Officer Bell, who in turn informed Harveston that someone reported loud noises. Harveston said, "Okay bro, we'll quieten it down, we'll go in the house." Officer Bell was unaware that Barron was lying on the floor of the Oldsmobile  whether he was dead is not clear, and Harveston volunteered no such information.
As Officer Bell was driving away he heard Harveston yell for Tim. Officer Bell was aware that Ronnie Poole, also a Brookhaven Police Officer, had written Tim Waldrop a ticket in the area so he believed that the "Tim" Harveston was hollering for was the same person who had received the ticket. Officer Bell radioed Patrolman Poole, who was also on duty, and asked him to go to Clara Street where Tim Waldrop lived to find out why he was running.
By this time, Officer Bell had driven his vehicle to the intersection of Choctaw and Sixth Street where he noticed the maroon Oldsmobile at the stop sign on Sixth Street. The Oldsmobile was first headed west but after Harvston spotted Officer Bell's police car he backed into a driveway and proceeded east on Hinds Street.
Officer Bell radioed Patrolman Poole and informed him that the Oldsmobile was headed toward Clara Street; he also called the tag number in to the dispatcher. During the time Bell made his radio communications he was following the Oldsmobile for a short distance. When Officer Bell's patrol car reached the corner of Hinds Street, the Oldsmobile was no longer in view. There was dust indicating that the driver of the Oldsmobile was speeding away.
Officer Bell turned on his blue lights and proceeded down Hamilton Street. When he arrived at Old Wesson Road, Bell observed a pile of dust on the side of the street, so he proceeded north and found the Oldsmobile wrecked in the front yard of a residence.
Carolyn Partman, who was spending the weekend at her parents home in Brookhaven, heard a loud noise on the early morning *368 of July 8, 1984. She went to the window and observed an Oldsmobile in the yard approximately eight feet from the bedroom window; the vehicle had knocked down a telephone pole before it came to rest in the yard. Although the driver's side was closest to the open window, she could not see the face of the young man who jumped out of the car because he held his hands up to his head. Partman telephoned for the police but was informed that officers were already on the scene. She also noticed that a man was lying on the floorboard of the Oldsmobile.
Officer Bell inspected the wrecked vehicle and found a man, later identified as Charles Barron, lying on the floorboard on the passenger side of the car. He radioed for an ambulance. A .38 revolver was retrieved from the floorboard of the Oldsmobile.
Charles Barron was removed from the wrecked vehicle. Because the emergency medical technicians found a faint pulse, they placed Barron in anti-shock trousers and transported him to Kings Daughter's Hospital in Brookhaven. After the examination in the emergency room, Barron was pronounced deceased.
Dr. V.J. Dhannavada performed an autopsy on the afternoon of July 8, 1984, and found that a gunshot wound received about the left eyebrow was the cause of death. A projectile was removed during the examination. Three separate pre-death injuries to the head other than the gunshot wound were found, their likely source a striking with a blunt instrument. John M. Allen, a firearams examiner at the Crime Lab, found that the projectile came from the .38 revolver which was found in the Oldsmobile.
Harveston fled after he wrecked the Oldsmobile in Partman's yard. He returned to Charles Wallace's trailer where he drove Keith Durr's pickup truck to his (Harveston's) house in order to get his car. Harveston then drove his Cadillac to a fishing camp in Woodville and informed his father about the incident. Harveston then got some sleep. Later that day Investigator Benton Burt of the Brookhaven Police Department telephoned the camp and advised Harveston's father that the police wanted to see Harveston. Richard Harveston transported his son to the Brookhaven Police Department.
Harveston was arrested and given his Miranda[1] rights around 7:35 p.m. on July 8, 1984. During the booking process Harveston was asked to remove his clothes so that his underclothes could be examined. Police Officers asked Harveston to remove his underclothes because they observed spots of blood on them. Larry Turner, a forensic serologist from the Crime Lab, analyzed the blood and found that it was Type A; this was the blood type of the decedent, Charles Barron.
Harveston never denied firing the fatal shot. He maintained, however, that his actions were either justifiable or excusable. His story was originally presented in a written statement he furnished to Brookhaven Police Officers shortly before 8:00 p.m. on July 8, 1984. That statement read as follows:
On Saturday 7-7-84 sometime around dark myself, Keith Durr and Timothy Waldrop went to the Sun Set in Pike County and sometime after midnight we left and went to the Panama in McComb and drank beer and mixed drinks. I drank some of Keith Durr's mixed drink and one of the bouncers made me leave. I was standing on the outside of the Panama and a man walked up and asked me if I needed a ride. I told him I needed a ride to Brookhaven and the man said his name was Charles took me to Brookhaven. We talked about guns on the way to Brookhaven and I told the man I had a.38 pistol I would sell him. We drove to my home and got the gun and went down the road toward the airport and on the way to the airport the *369 man was driving and reached over and and opened my pants up and grabbed my penis. I pushed his hand back and the man pushed him brakes and the gun which was on the seat between us fell on the floor on my side of the car. I reached down and got the gun and as we were tussling the pistol shot one time and the man fell over in my lap. I then got in the driver's seat and drove to Charles Wallace's house on Choctaw St. and talked to Timothy Waldrop and then I saw a patrol car and left and wrecked the man's car and got out and ran.
Harveston's trial testimony was consistent with his voluntary statement. After Barron offered him a ride to Brookhaven  which Harveston accepted  Barron began talking to him about music and different bars. Harveston mentioned that the only way he could get into bars was to have a hunting license as an i.d. The conversation shifted to guns and Barron mentioned that he would like to buy a small handgun. Harveston offered to sell him one which he owned and Barron expressed interest in seeing it. Barron took Harveston to the latter's home in Brookhaven. Harveston entered the house and got the pistol (a fact testified to by Harveston's brother who was awakened during the process) and the two decided to go out in the country near the airport to fire it. At this point, according to Harveston:
I got back in the car with the man and laid the gun down between us on the seat, and we was going out there by the airport and he put that tape back in, that music, that classical music or whatever, and we was riding out there, I reckon just listening to that music and was going to shoot that gun when we got out there, and right when we turned off at the airport he just looked over there at me, and he said, `You got some fine legs, I'm going to get some of that,' and he ripped open my britches and grabbed my dick and went to squeezing it and that's when I went to hollering and cussing him. He wouldn't leave me alone. He throwed on brakes and the gun went on the floor and I reached down and got it and he did too, he reached down there, and I come up with the gun and caught my hand and I was trying to get away from him and the gun just went off, I don't know if I had my finger on the trigger or not, and that's the way it happened.
R.440.
Harveston testified at this point that he was scared and drove the car (the maroon Oldsmobile) in search of help. He remembered seeing "Timmy over at Charles' trailer" and trying to tell him that he had shot a man, but Timmy "took off running". He also remembered seeing a policeman shining a spotlight out in the yard but was unclear about the details. He got back into the car and was going to find someone else when he wrecked it and "ended back over at Charles Walls' house". Harveston did not deny that he had talked to Officer Bobby Bell during the course of the evening but couldn't remember it.
After leaving the wrecked car Harveston ran back to Charles Wallace's house where his friend Keith Durr was asleep or passed out in his truck. He got in the truck and tried to wake Durr up but couldn't, so Harveston went home and got in his car and left to find his father who was at the fishcamp in Woodville. The camp was about an hour and a half drive. When Harveston reached the camp, he told his father of the events of the evening and then fell asleep out of exhaustion. His father woke him up and told him that he needed to go to the Brookhaven Police Department to talk to Inspector Burt who had called.
Testimony of everyone concerned was that Roger Harveston was extremely upset when he came to the police department. He was crying during the course of his confession and can be heard crying on the taped confession that he gave.
Witnesses for the State included David Myers, the owner of the Panama Limited Lounge, who testified that he knew Charles Barron during his lifetime and saw him leave the Panama shortly after Roger *370 Harveston left. Myers looked out the window and saw Barron talking to Roger Harveston on the sidewalk of the lounge. Myers knew that Barron was not married nor had he ever been married and that he lived with his mother. He suspected that Barron might be a homosexual and noted that Barron had effeminate ways.
Judy Mader and her husband, Al Mader, run Yesterdays Restaurant and Panama Limited Lounge. She knew that Charles Barron had received tips that evening and noted that he had his apron that evening. She did not think Charles Barron was effeminate nor did she think he was a homosexual.

B.
These criminal proceedings were formally commenced on August 28, 1984, when the Grand Jury of Lincoln County returned an indictment charging Harveston with capital murder. The indictment alleged that on July 8, 1984, Harveston killed and murdered Charles Barron while engaged in the commission of the crime of robbery in contravention of Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1985). The State apparently was of the view that Harveston had taken Barron's wallet, said to have contained an unspecified amount of cash money, although neither wallet nor cash were ever recovered or in any way attributed to Harveston.
The case was called for trial on September 21, 1984. The next day, after four and a half hours of deliberation, the jury found Harveston guilty of the lesser-included offense of murder. Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1985). The Circuit Court thereupon sentenced Harveston to imprisonment within the custody of the Mississippi Department of Corrections for the remainder of his life. Miss. Code Ann. § 97-3-21 (Supp. 1985).
Harveston timely filed the usual post-trial motions, all of which were denied. This appeal has followed and the matter is now ripe for review.

III.
Harveston's principal assignment of error is the Circuit Court's refusal to grant his request for a peremptory instruction. The substance of this point, of course, was renewed via Harveston's motion for judgment of acquittal notwithstanding the verdict which was overruled and denied on September 27, 1984.
Harveston tests the legal sufficiency of the evidence supporting the verdict of guilty on each element of the offense of murder. Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1985). Where such a point is presented to this Court on appeal of a criminal conviction, we must, with respect to each element of the offense, consider all of the evidence  not just the evidence which supports the State's case  in the light most favorable to the State. Fisher v. State, 481 So.2d 203, 212 (Miss. 1985); Callahan v. State, 419 So.2d 165, 174 (Miss. 1982); Sadler v. State, 407 So.2d 95, 97 (Miss. 1981). The credible evidence which is consistent with the verdict must be accepted as true. Spikes v. State, 302 So.2d 250, 251 (Miss. 1974). The State must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Hammond v. State, 465 So.2d 1031, 1035 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984); Glass v. State, 278 So.2d 384, 386 (Miss. 1973). We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Fisher v. State, 481 So.2d 203, 212 (Miss. 1985); Cook v. State, 467 So.2d 203, 208-09 (Miss. 1985). Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. Neal v. State, 451 So.2d 743, 758 (Miss. 1984); Gathright v. State, 380 So.2d 1276, 1278 (Miss. 1980).
The heart of Harveston's attack on the jury's verdict is the familiar rule that, where the defendant or the defendant's witnesses are the only eyewitnesses to a homicide, their version of what happened, *371 if reasonable, must be accepted as true, unless substantially contradicted in material particulars by credible evidence, physical facts or facts of common knowledge. May v. State, 460 So.2d 778 (Miss. 1984); Cummings v. State, 271 So.2d 407, 408-09 (Miss. 1972); Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933). This rule  long known in our jurisprudence as the Weathersby rule  is familiar to all, although we sometimes overlook the fact that it is nothing more than a restatement of the general rule recited above; that is, if the defendant and his witnesses are the only eyewitnesses to the homicide and if their version of what happened is both reasonable and consistent with innocence and if, further, there is no contradiction of that version in the physical facts, facts of common knowledge or other credible evidence, then surely it follows that no reasonable juror could find the defendant guilty beyond a reasonable doubt. Under such circumstances we have always mandated that peremptory instructions be granted whether under the label of Weathersby or otherwise.
Conversely, we have held repeatedly that, if there are circumstances shown in the evidence which materially contradict the defendant's version of self-defense, the jury is not required to accept his version, but may in determining guilt or innocence consider his version of self-defense along with the conflicting evidence and any unfavorable inferences therefrom. May v. State, 460 So.2d 778, 782 (Miss. 1984); Johnson v. State, 346 So.2d 927, 929 (Miss. 1977).
In this record there are a number of factors which render Harveston's version of the events of July 8, 1984 subject to reasonable doubt. In the first place, the homosexual assault was allegedly begun while Barron was driving and Harveston was sitting in the right front seat. The photographs in evidence show that the Oldsmobile is a very large one, a fact of some importance when it is remembered that Harveston claims that Barron, while still driving, reached over with one hand, ripped over his jeans, pulled them down a distance and squeezed his penis. Only after Harveston began resisting did Barron apply the brakes to the automobile. We are not suggesting that this could not have happened, only that the jury may reasonably have received this story with a grain of salt.
Beyond that, we note that the pathologist testified that Barron was shot at point blank range above the left eyebrow (although we are not given the precise angle of entry). It seems less than likely that a struggle over the gun between the much larger Barron  weighing 180 pounds  and the slightly built Harveston  weighing 130 pounds  would have resulted in such a point of entry of the fatal bullet. It is a more reasonable inference that the gun was fired while under Harveston's complete control.
Of further importance is Harveston's encounter with Officer Bobby Bell shortly after the shooting. Officer Bell testified that Harveston walked over to the police car and talked with him. Bell said that Harveston did not ask for help and that he appeared calm. Harveston, it will be recalled, claimed that he was upset and intoxicated. Of more importance is the fact that Harveston did not advise Officer Bell that Barron had been shot and was still in the car only a few feet away. See Clingan v. State, 404 So.2d 1386, 1390 (Miss. 1981). Beyond this, the fact that Harveston did not remember the encounter with Officer Bell coupled with his admission that he had been drinking extensively earlier in the evening raises doubts regarding the accuracy of Harveston's memory of other events of that morning and the preceding evening.
We note further Harveston's flight in Barron's car which ended with it being wrecked in Carolyn Partman's parents' yard. Harveston continued to flee on foot, leaving Barron's body unattended, and located another vehicle and drove ninety miles away to his father's fishcamp near Woodville. Our law has long recognized the premise that unexplained flight may be accorded an inference of guilt. Pannell v. *372 State, 455 So.2d 785 (Miss. 1984); Lewis v. State, 454 So.2d 1306, 1308 (Miss. 1984); Clingan v. State, 404 So.2d 1386, 1390 (Miss. 1981); McElwee v. State, 255 So.2d 669, 671 (Miss. 1971). Again we have a permissible inference suggesting guilt which the jury may reasonably have drawn.
Further troubling is the fact that the emergency medical technicians who took Barron from the wrecked Oldsmobile to the Kings Daughters Hospital found a faint pulse. This suggests the inference that while Harveston was speeding along the road in the Oldsmobile, Barron was still alive, yet Harveston sought no medical aid for him.
The pathologist explained that Barron had suffered three non-fatal blows to the head by the proverbial blunt instrument. Photographs of Barron's body reflect that these were not insignificant blows. There is no evidence in the record that anyone but Harveston could have inflicted these blows, although concededly no appropriate blunt instrument was ever found. Harveston sought to show that these injuries could have occurred if Barron's head had bounced on the floorboard of the car and slid along the car's carpeting. The fact that Dr. Dhannavada acknowledged that this could have happened does not deprive the jury from doubting that it did.
Of course, this assignment of error turns not upon how we see the evidence, for our institutionally mandated and self-imposed scope of review is quite limited. That limitation is premised upon our candid recognition that the jury system is at best the least imperfect way we have of determining guilt or innocence. We cannot help but be aware that a rational, fair-minded juror could well have found Harveston not guilty. Nevertheless, were we to substitute our view for the jury's, one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings have been made by twelve citizens, peers of the defendant, who are on the trial scene and have smelled the smoke of the battle. Fisher v. State, 481 So.2d 203, 214 (Miss. 1985); Burge v. State, 472 So.2d 392, 396 (Miss. 1985); City of Jackson v. Locklar, 431 So.2d 475, 479 (Miss. 1983).
That the jury was liberally instructed regarding Harveston's view of the case gives us further cause for deference to the verdict. For example, Instruction No. D-5 told the jury that it should acquit "if you determine from the evidence that there is any reasonable explanation consistent with the defendant's innocence, ... ." Instruction No. D-7 was a justifiable homicide instruction embodying the self-defense theory and was, if anything, more liberal to Harveston than he was actually entitled in the sense that the jury was advised it could find the homicide justifiable even though Harveston had no reasonable grounds to anticipate or fear his own demise.[2]See Miss. Code Ann. § 97-3-15 (Supp. 1985); Flowers v. State, 473 So.2d 164 (Miss. 1985); Cook v. State, 467 So.2d 203, 207 (Miss. 1985).
Instruction D-8 was a fairly worded excusable homicide instruction embodying the accident theory.[3] Miss. Code Ann. § 97-3-17 (Supp. 1985) Beyond this, Instruction No. D-3 advised the jury that the burden of proof rested on the State on all issues in the case and Instructions D-4 and D-6 thoroughly instructed the jury regarding the beyond-a-reasonable-doubt burden of proof standard. No less than six instructions submitted to the jury contained beyond-a-reasonable-doubt burden of proof language.
Further evidence that the jury was not simply buying that which the prosecution was selling was its disposition of the capital murder charge. In the indictment and at trial the State's theory was that Harveston robbed and killed Charles Barron. Miss. Code Ann. § 97-3-19(2)(e) (Supp. *373 1985). The jury was fully instructed on the robbery theory and on the manner in which robbery under our law could furnish an underlying felony for a capital murder conviction. Notwithstanding, the jury found Harveston guilty of murder, not capital murder, the jury having obviously found that the State had failed to meet its burden of proof on the issue of robbery.
In the end we may not deny awareness of the enormity of the impact of mistake in a case such as this nor our capacity for such. A dispassionate study of this record has led us to the view that only by bending the rules  rules we have enforced against so many others  may we reverse. The assignment of error is denied.

IV.
Harveston assigns error to the Circuit Court's refusal to allow the testimony of Dewayne Burns, a state highway patrolman in Lincoln County. The defense had called Patrolman Burns for the purpose of showing that Barron frequented rest areas much in the mode often used by homosexuals. Harveston argues that evidence pertaining to the turbulent character of the victim as a homosexual is essential to his defense and that he had a right under the Sixth Amendment to present this information to the jury.
The record reflects that Burns had served as a state highway patrolman for eleven years in Lincoln County. Burns would have testified that he knew Charles Barron from coming in contact with him in a rest area on the north bound side of I-55 just inside the Lincoln County line. He had seen Barron parking in this rest area space two or three times a week for several months and had questioned him on three separate occasions. Barron would always say that he was taking a nap even though he lived in the vicinity of the rest area. Burns testified that he patroled the rest area looking for stranded motorists, public drunks or homosexuals but had never seen Barron indulge in any illegal act.
The State objected to this testimony as irrelevant and the Circuit Court sustained that objection stating that, "You can't have just trial by innuendo."
The general rule is that in homicide prosecutions the character and reputation of the deceased are not issues. Fisher v. State, 481 So.2d 203, 225 (Miss. 1985); Shinall v. State, 199 So.2d 251, 257 (Miss. 1967); Spivey v. State, 58 Miss. 858, 864-66 (1881). Although not effective when this case was tried, the comments to Rule 404(a)(2) of the Mississippi Rules of Evidence speaks to the exceptions of this general rule:
Ordinarily a victim's character is irrelevant. The fact that a "bad" man rather than a "good" man was murdered or beaten is inconsequential. (citation omitted) Under specific circumstances, however, the character of a victim may be relevant. This would most likely arise in instances where the defendant claims that the victim was the initial aggressor and that the defendant's actions were in the nature of self-defense. In order to prove this, the defendant must offer evidence of an overt act perpetrated against him by the victim. Freeman v. State, 204 So.2d 842 (Miss. 1969). Having proved the act, the defendant may then offer proof of the victim's character. Shinall v. State, 199 So.2d 251 (Miss. 1967) cert. denied 389 U.S. 1014 [88 S.Ct. 590, 19 L.Ed.2d 660] (1967), outlined the permissible exceptions which would still be applicable under this rule. The recognized exceptions are:
(A) When, from the circumstances of the case, it is a part of the res gestae; ...; (B) where the evidence of the homicide is wholly circumstantial ...; (C) when it is doubtful as to who the aggressor was at the time of the homicide ...; or (D) where the immediate circumstances of the killing render it doubtful as to whether or not the act was justifiable."
Comment (a), Rule 404, Miss.R. of Evi. See also Amis v. State, 204 So.2d 848, 852 (1967); Chase v. State, 46 Miss. 683, 707 (1872); Wesley v. State, 37 Miss. 327, 347 (1859); Jolly v. State, 13 Miss. 223, 225 (1849).
*374 Officer Burns' testimony related to a collateral matter, i.e., that Charles Barron liked to drive his vehicle to the rest stop on I-55, right inside Lincoln County, in order to sleep. It is true that part of Burns' duties as a patrolman involved stranded motorists, public drunks, vandalism on abandoned vehicles, homosexuals or anything "out of the ordinary". Officer Burns became acquainted with Barron because he was observed sitting in his car at the rest area two or three times a week for several months. We note, however, that the rest area was a public place, and Charles Barron was never observed doing anything illegal there. For example, there is no evidence that Charles Barron was meeting a woman or man at the rest area; he was always observed alone and never doing anything out of the ordinary.
When the Circuit Judge sustained the State's objection to Dwayne Burns' testimony he said:
... You can't have just trial by innuendo, and something like that, I just  I don't know why the person was there, but apparently he was not violating any law, the officer never made an arrest, there was no one else there, or seen by the officer. I don't know that his actions by being there were any more unlawful, illegal or improper than that of the patrolman.
Without doubt, credible evidence that Barron was a homosexual would in the present context have been admissible. The mere fact of Barron's somewhat unexplained presence at a public highway rest stop, without more, is not necessarily credible evidence of much of anything. It was within the Circuit Court's discretion to consider that the prejudicial effect of such evidence would outweigh its probative value. The assignment of error is denied.

V.
Harveston finally assigns as error the Circuit Court's submission to the jury of Instructions S-4 and S-6 which had been requested by the State. These are the instructions which explain to the jury the lesser-included offenses of murder and manslaughter and authorize the jury's consideration of whether the evidence warranted a guilty verdict on either of such offenses.
Harveston's position is that he should have been found guilty of capital murder under the indictment or he should have been acquitted, and that the submission of the lesser-included offense instructions gave the jury a middle ground which operated to his prejudice. He notes the fact that the indictment was for capital murder only and argues that the jury may not be instructed on an offense not charge in the indictment.
These assignments are without merit. Miss. Code Ann. § 99-19-5 (1972) is authority for the proposition that an indictment need not specify all lesser-included offenses in order that such be submitted to the jury. Here, our only concern is the lesser-included offense instruction regarding the crime of murder. Since Harveston was not found guilty of manslaughter, any problem with the submission of that instruction to the jury is moot.
The question whether the murder instruction should been submitted, in addition to that defining capital murder, is controlled by our general rule regarding the submission of jury instructions, i.e., is it warranted by the evidence? For example, in Fairchild v. State, 459 So.2d 793 (Miss. 1984) we stated:
Where under the evidence a reasonable jury could find the defendant not guilty of the principal charge made in the indictment but guilty of a lesser-included offense, the trial jury ordinarily should instruct the jury regarding the elements of that lesser-included offense. Knowles v. State, 410 So.2d 380, 382 (Miss. 1982); Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984), expressly declares that, only where the evidence could only justify conviction of the principal charge could a lesser-included offense instruction be refused.
459 So.2d at 800. See also Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985); Harbin v. State, 478 So.2d 796, 799 (Miss. *375 1985); Lee v. State, 469 So.2d 1225, 1230-31 (Miss. 1985).
We recognize in certain cases, as a matter of trial strategy, defense counsel may wish to have the case put to the jury on an all or nothing basis, the jury's alternatives being to find the defendant guilty as charged in the indictment or acquitted. Our law, however, allows the prosecution to request and obtain lesser-included offense instructions, as it does the defense. The test for whether such an instruction should be granted is the same: is it warranted by the evidence? Where the answer is affirmative, the defendant has no right to complain of the circuit court's submission to the jury of a properly phrased lesser-included offense instruction, either at the request of the prosecution or on its own motion. See Cole v. State, 405 So.2d 910, 913 (Miss. 1981); Jackson v. State, 337 So.2d 1242, 1255 (Miss. 1976); Dover v. State, 227 So.2d 296, 301 (Miss. 1969); Huffman v. State, 192 Miss. 375, 378, 6 So.2d 124, 125 (1942).
Here the question, purely and simply, is whether under the evidence a rational jury could have found Harveston not guilty of capital murder but guilty of murder. The elements of murder per se are the same for either offense. Compare subsections (1) and (2) of Miss. Code Ann. § 97-3-19 (Supp. 1985). The evidence which would have supported a finding of guilty of the murder component of the capital murder charge would similarly support a finding of guilty of the lesser-included offense of murder. The point is brought home by a consideration of the evidence regarding the alleged underlying felony, to-wit: robbery. The State argued that Harveston murdered Barron while in the course of committing a robbery. Suffice it to say that the State's evidence of the offense of robbery was sufficiently weak that the jury, though well instructed on the point, refused to find him guilty of robbery. As the jury was well within its limits in so finding under the evidence, the Circuit Court was similarly within its prerogatives in submitting to the jury an instruction defining the offense of murder with the underlying felony of robbery in no way included.
This assignment of error is denied.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED
WALKER, C.J., ROY NOBLE LEE and HAWKINS, P.JJ. and DAN M. LEE, PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] See Rule 1.03, Miss.Unif.R. of Cir.Ct.Prac.; Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).
[2] Instruction S-5 was the State's instruction embodying the self-defense theory.
[3] When asked by the Circuit Judge if he had anything to say before imposition of sentence, Harveston replied, "It was an accident, Your Honor."