KING, C.J.,
for the Court.
¶ 1. On March 23, 2006, William Terry Davis (William) was convicted of the murder of Rena Davis, his ex-wife. He was sentenced to a term of life in the custody of the Mississippi Department of Corrections. Aggrieved, Davis appeals and alleges that: (1) the evidence was insufficient to support the verdict and (2) the verdict was against the overwhelming weight of the evidence. We find no error and affirm.
FACTS
¶2. On the morning of May 17, 1994, Sam Wilkinson traveled to Rena’s house. Upon his arrival, he found Rena lying on the floor, dead. She had been brutally beaten. It was stipulated at trial that she had died from blunt force trauma. Wilkinson called the police and informed them of what he had found. Once the police arrived, they began an investigation into who had caused Rena’s death. They examined the crime scene and interviewed a number of witnesses. Through the investigation, the police obtained several pieces of evidence, but not enough to arrest any suspects. However, they were able to determine four things: (1) Rena died from blunt force trauma; (2) she was killed sometime late in the evening on May 16 or early in the morning of May 17; (3) the telephone lines to her house had been cut; and (4) Rena had just learned that she was pregnant. While William was not initially arrested for the crime, he was a suspect.
¶ 3. After a period of time, no further discoveries were made, and the case was determined to be “cold.” Investigator Jody Waldrop had been assigned to work on Adams County cold cases. It was during his investigation that several new items of evidence were discovered. One piece of evidence came from Tammy Johnston, William’s former sister-in-law. Johnston came forth with information of a serious fight between William and Rena that had occurred approximately one year before Rena was murdered. She stated that she arrived at Rena’s house after what appeared to have been an altercation between William and Rena. William was still visibly upset with Rena, who was lying in the bed, packed with ice.
¶ 4. Another piece of new evidence came from William and Rena’s oldest daughter, Bridget Davis. Bridget testified that on the night prior to her death, Rena carried *810 Bridget and Bridget’s sister to meet William, so they could spend some time with him. It was there that William and Rena got into a loud argument. Bridget testified that on the night Rena was killed, she went to sleep with her father on the couch. When she awoke, he was no longer there. However, she was unable to say if he left the house that night. Also, she provided more insight into the violent relationship of her parents.
¶ 5. However, the most important piece of new evidence came eleven years after Rena’s death from Ricky Lee, William’s friend. After he was charged with possession of crystal methamphetamine and had been released on bond, Lee told investigators that he had additional information as to Rena’s death. He stated that on the night Rena was murdered, William came to him at work and said that he had really messed up this time, and that he had beat her bad. Two weeks after Lee had this conversation with William, Lee was standing outside his house burning rubbish. William approached him and asked Lee if he had told the police anything. When Lee responded that he had not, William handed him a tent stake to dispose of, presumably in the fire. Lee took the stake and threw it near the fire, but not into the fire. William commented that the stake might be confused as the murder weapon. After William left, Lee picked up the stake and placed it in his storage shed.
¶ 6. With the addition of this new evidence, William was charged with the murder of Rena. Throughout the investigation, William maintained that he was at his parents’ house on the night of the murder. William’s parents and niece testified in support of his alibi. Following the trial, the jury found William guilty of Rena’s murder.
¶ 7. William timely filed this appeal.
ANALYSIS
¶ 8. William makes two arguments on appeal. He alleges that the evidence presented at trial was insufficient to support the verdict, and that the verdict was against the overwhelming weight of the evidence.

I. Whether the evidence was sufficient to support the conviction of murder.

¶ 9. William first alleges that the evidence was legally insufficient to support the jury’s conviction of murder. Upon a review of the sufficiency of the evidence, we must accept as true all evidence tending to support the verdict, as well as any inferences that may be drawn from that evidence. Deloach v. State, 811 So.2d 454, 456(¶ 6) (Miss.Ct.App.2001). After a review of that evidence, “[w]e may reverse only where with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.” Id. (quoting Harveston v. State, 493 So.2d 365, 370 (Miss.1986)).
¶ 10. After a review of the evidence in support of the verdict, we find that the evidence was sufficient to support the jury’s verdict. Charles Sullivan testified that approximately two weeks before Rena’s death, William told him that if Rena tried to move to Colorado with their kids, he would kill her. Wilkinson testified that he and Rena were in fact planning to move to Colorado about the time of her death.
¶ 11. Lee testified that on May 17, William came to him visibly upset and hysterical and stated that he “messed up. [He] beat her real bad this time.” Further, Lee testified that a couple of weeks after he spoke with William, William came by his house and asked Lee to dispose of a tent stake that might be confused for the mur *811 der weapon. Dr. Steven Hayne testified that the stake that Lee received was consistent with what caused the blunt force trauma that killed Rena. Dr. Hayne also stated that Rena received a broken thumb and several injuries to her right hand that indicated she was trying to defend herself. Investigator Waldrop with the Adams County Sheriff Department, testified that there did not appear to be any evidence of a robbery, burglary, or sexual assault. Finally, Bridget testified that on the night of the murder, she fell asleep with William on the couch; however, when she awoke, he was no longer there.
¶ 12. From this evidence, a jury might reasonably infer that William learned of Rena’s intention to move to Colorado. Then either late in the evening on May 16 or early in the morning on May 17, William left his parents’ residence to go to Rena’s house. Upon his arrival at Rena’s house, he cut the telephone fines to the house. Then, he followed through with the threat he had communicated to Sullivan. After he had beaten Rena to death and while still overcome with emotion, he admitted the act to Lee, his friend.
¶ 13. Based on the evidence presented and the reasonable inferences that flow from that evidence, we find that a reasonable juror could have found that William murdered Rena. Therefore, this issue is without merit.

II. Whether the verdict was against the overwhelming weight of the evidence.

¶ 14. William’s second argument is that the verdict was against the overwhelming weight of the evidence. In our review of this issue, we once again view the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005). However, we do not limit our review only to the evidence that supports the prosecution’s case. Jackson v. State, 580 So.2d 1217, 1219 (Miss.1991). We review all the evidence presented at trial “in the fight most consistent with the verdict.” Id. After our review of the evidence, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844(¶ 18).
¶ 15. In addition to the evidence previously discussed, William provided several alibi witnesses for the night of the murder, and each of these witnesses testified that William was at his parents’ home from the time they went to bed until the time they awoke. The first witness was Nicole Howell, William’s niece. She testified that she was with William at his parents’ home on the night of the murder. However, she stated that she went to her room around 2:00 a.m. Further, she admitted that it was possible for someone to have left the house without her knowing about it. The second witness was Boyce Davis, William’s father. He also testified that William was at his house on the night of the murder. However, he testified that he went to bed around 10:00 p.m. and woke up around 4:00 a.m. The final alibi witness that William presented was Jeanette Davis, his mother. She testified that William was at their house when she went to bed at 10:30 p.m., but she also stated that she went to bed before Boyce. She further testified that William was there when she awoke at 3:00 a.m. to prepare for a trip to Canton.
¶ 16. Even if we take as true the testimony of William’s alibi witnesses, there is still a period of time for which William’s whereabouts are unaccounted. This period of unaccounted for time is within the window of opportunity for Rena’s death. William also points to Lee’s credibility, questioning Lee’s credibility since he did not come forth with the information regarding Rena’s murder until after he had been charged with drug possession. How *812 ever, it was the duty of the jury to assess whether Lee was a credible witness. The jury apparently found Lee to be credible, and we see nothing in the record that causes us to have a contrary view. After our review of the evidence presented at trial, we cannot say that the verdict was so contrary to the overwhelming weight of the evidence that it created an unconscionable injustice. Therefore, this allegation of error is without merit, and we affirm the judgment of the trial court.
¶ 17. THE JUDGMENT OF THE CIRCUIT COURT OF ADAMS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO ADAMS COUNTY.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.