# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-01323-SCT

*JEREMY CHARLES CHILDRESS A/K/A JEREMY CHILDRESS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/27/2023 |
| TRIAL JUDGE: | HON. RANDI PERESICH MUELLER |
| TRIAL COURT ATTORNEYS: | IAN LAWRENCE BAKER |
| | PATRICIA K. SIMPSON |
| | FRANK PHILIP WITTMANN, IV |
| | CHRISTOPHER ALAN GREEN |
| | TYLER COLTON LADNER |
| | LAUREN RUTH HILLERY |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/07/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Jeremy Childress was convicted of first-degree murder following a jury trial in the Harrison County Circuit Court. Childress appeals, claiming there was insufficient evidence to support a first-degree murder conviction. Childress also claims that the jury's verdict is

contrary to the weight of the evidence. Finding no merit to either claim, we affirm Childress's conviction for first-degree murder.

## FACTS

¶2. In August 2021, a Neshoba County sheriff's deputy responded to a 911 call about a man with a handgun threatening to commit suicide outside a residence. When Deputy J.W. Jenkins Jr. arrived, Childress was running around his mother's yard holding a gun to his head.

¶3. Deputy Jenkins persuaded Childress to put the gun down. Deputy Jenkins retrieved the gun when Childress was not looking. After Childress realized that Deputy Jenkins had taken the gun, Childress retrieved another gun—a Rossi .357 revolver—from his truck. Deputy Jenkins once again persuaded Childress to put that gun down.

¶4. Childress was taken into custody, at which point he gave a voluntary statement to law enforcement that he had killed his girlfriend, Michelle Hester. Childress said that he had shot Hester in the top of the head and that she was in a utility room at a residence in Harrison County. Childress was provided medical attention by Neshoba EMS to an injury on his foot.

¶5. Neshoba County authorities notified Harrison County law enforcement. Captain Rebecca Wright with the Harrison County Sheriff's Department went to the residence along with another deputy to conduct a welfare check. Captain Wright noticed that a sliding glass door in the back of the house had been broken. The kitchen and dining area were in a state of disarray, and Captain Wright noticed several guns throughout the house. Captain Wright then found Hester's body in a utility room.

¶6.     Kimberly Ezell, a crime scene technician, processed the scene. She testified that she observed broken glass from a sliding glass door, multiple guns, and blood on the porch and on the floor inside the house. She said Hester's body was in a seated position in the corner of the utility room. And she said no guns or knives were found near Hester's body or anywhere else in the utility room.

¶7.     Two crime scene photographs that were submitted into evidence showed the location of Hester's body in the utility room. Each showed blood around Hester's body and blood on the wall and the door near her body. Ezell testified that she did not find any blood above or higher than what the photos depicted.

¶8.     Dr. Stack Turner, a forensic pathologist who performed Hester's autopsy, testified that the cause of death was a bullet wound to the top of the head. She said that the location of the wound was consistent with a gun being pointed at the head. She described the wound as "a perfect circle with perfect marginal abrasion." She said that there was no gunpowder residue or "stippling" found by the entrance wound. This indicated to her that the gun barrel was not directly touching on the top of the head when it was fired. Dr. Turner said the bullet traveled through the brain and "ended up in the back of the neck." She said that Hester would have been incapacitated after being shot and that Hester likely would have dropped anything that she was holding in her hands at the time.

¶9.     Lori Beall, a forensic expert in firearms, determined that the projectile recovered from Hester's body had been fired from the same Rossi .357 revolver recovered from Childress in Neshoba County. She explained that the gun can be fired in either single action or double

action, and she said single action means when "you cock the hammer and you pull the trigger." She said double action is when "you pull the trigger and it cocks the hammer[.]" She said that thirteen to fifteen pounds of pressure is required to pull the trigger in double action, and greater than three pounds of pressure is required to pull the trigger in single action. She further explained that the gun used has a hammer block. She said that when the hammer is cocked, the hammer block blocks the hammer from striking the firing pin in case the hammer were to be "struck from the rear accidently."

¶10. Following the State's case-in-chief, Childress moved for a directed verdict, claiming that the State had failed to prove deliberate-design murder. The trial court denied the motion.

¶11. Afterwards, Childress testified. He said that he and Hester had been in a relationship for two years and that they were living in the house together. Both had children from other relationships

¶12. According to Childress, on the evening of Hester's death, he and Hester had drinks and dinner. Afterwards, they got into an argument about conflicting plans to visit their respective children.

¶13. Childress said that during the argument, Hester blew up at him and began slinging things. He said Hester grabbed a knife and put it to his ribs. Childress said he walked away from Hester, but she continued throwing mail at him.

¶14. Childress said that Hester then reached in the middle drawer under the bar and pulled out her gun, at which point he "darted to the back room and grabbed" the .357 revolver.

4

According to Childress, the next thing he knew, they were standing in the utility room arguing "and the gun goes off and she drops."

¶15. Childress said that when Hester pulled her gun he went into a rage. He said that he did not know if Hester still had the gun or knife when she went into the utility room. He said that all he remembered at that point was them yelling at each other in the utility room and that they were facing each other and "the gun went off and she dropped."

¶16. According to Childress, when he retrieved the .357 revolver from the bedroom, he cocked the hammer. And when they were in the utility room, he raised the revolver above Hester's head when the two were arguing. He maintained throughout his testimony that he did not intend to discharge the gun.

¶17. Childress was questioned about telling investigators that Hester was sitting on the floor when she was shot. Childress responded that he "worded that wrong" and that "that came out wrong."

¶18. Childress also acknowledged that he had previously told law enforcement that Hester was kicking him out of the house before he shot her.

¶19. Childress said that after the shooting, he walked outside and decided to leave. But he realized that he did not have his keys or wallet. He then broke in through the sliding glass door and cut his toe on the shattered glass. Childress got his keys and left.

¶20. He said his plan was to commit suicide. But he first wanted to say goodbye to his mother in Neshoba County.

¶21. After the close of evidence, the jury received instructions for first-degree murder, second-degree murder, heat-of-passion manslaughter, as well as both imperfect-self-defense and culpable-negligence manslaughter. The jury found Childress guilty of first-degree murder.

**DISCUSSION**

¶22. In reviewing a challenge to the legal sufficiency of the evidence in a criminal trial, this Court considers whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (internal quotation marks omitted) (quoting *Parish v. State*, 176 So. 3d 781, 785 (Miss. 2015)). This Court views all of the evidence in the light most favorable to the prosecution, accepts all the evidence supporting the verdict as true, and gives the prosecution "the benefit of all reasonable inferences flowing from the evidence." *Hogan v. State*, 755 So. 2d 1073, 1075 (Miss. 2000) (citing *Rhodes v. State*, 676 So. 2d 275, 281 (Miss. 1996)).

¶23. In reviewing a challenge to the weight of the evidence, this Court will not disturb the jury's verdict unless it appears to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Willis v. State*, 911 So. 2d 947, 950 (Miss. 2005) (citing *Stewart v. State*, 909 So. 2d 52, 57 (Miss. 2005)).

**I. Sufficiency of the Evidence**

¶24. Childress contends that the trial court should have granted his motion for a directed verdict on the first-degree murder charge and allowed the jury to deliberate only on second-degree murder and manslaughter. Childress claims that since there were no eyewitnesses to

6

the homicide and his version of events was neither contradicted nor unreasonable, this Court's holding in **Weathersby v. State**, 165 Miss. 207, 147 So. 481 (1933), should apply to this case.

¶25. The State contends that Childress did not raise the **Weathersby** rule at trial and, therefore, is procedurally barred from raising it on appeal. *See **Jones v. State***, 154 So. 3d 872, 877 (Miss. 2014) ("Because [defendant] did not raise the **Weathersby** rule at trial, the issue is procedurally barred on appeal." (citing **Page v. State**, 64 So. 3d 482, 489 (Miss. 2011))).

¶26. The State further contends that procedural bar notwithstanding, the **Weathersby** rule is inapplicable to Childress's case. The State submits that Childress provided inconsistent accounts of the killing. And Childress's trial testimony about what had occurred was both unreasonable and contradicted by the physical facts.

¶27. The State is correct that Childress did not raise the **Weathersby** rule at trial or in his post-trial motion. The State is also correct that the **Weathersby** rule is inapplicable in this case, despite any procedural bar.

> Under the **Weathersby** rule:
>
> Where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

**Weathersby**, 147 So. at 482 (citing **Houston v. State**, 117 Miss. 311, 78 So. 182 (1918)).

7

¶28. The rule "does not automatically apply when the defendant is the only eyewitness." *Jones*, 154 So. 3d at 878. And it "has no application where the defendant's version is patently unreasonable, or contradicted by the physical facts." *Id.* (quoting *Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989)). Nor is it an instruction for the jury; rather, it serves as "a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict." *Turner v. State*, 796 So. 2d 998, 1002 (Miss. 2001) (internal quotation mark omitted) (quoting *Mallett v. State*, 606 So. 2d 1092, 1094 (Miss. 1992)). Ultimately, the rule is "nothing more than a statement of the general principle that the hypothetical 'reasonable' juror must have some material evidence, contradictory to defendant's version, upon which a verdict of guilty beyond a reasonable doubt could be found." *Lanier v. State*, 533 So. 2d 473, 490 (Miss. 1988) (quoting *Harveston v. State*, 493 So. 2d 365, 371 (Miss. 1986)).

¶29. This Court has further stated that:

> In those cases in which the defendant is the only eyewitness to the slaying, and in which the *Weathersby* rule is inapplicable (i.e., the defendant does not secure a directed verdict of acquittal), it then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit.

*Johnson v. State*, 987 So. 2d 420, 425 (Miss. 2008) (quoting *Blanks*, 547 So. 2d at 33-34). Also, "if the defendant's . . . testimony satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as their testimony would be the basis for a valid conviction." *Id.* That is the case here.

¶30. Childress acknowledges on appeal that his case presented a jury question for either second-degree murder or manslaughter. Indeed, defense counsel told the jury during closing

argument that "[w]e're not asking you to find [Childress] not guilty of something[.]" Defense counsel concluded by asking the jury to find Childress guilty of manslaughter.

¶31. Consistent with **Johnson**, the **Weathersby** rule is inapplicable in this case. As mentioned, Childress moved for a directed verdict after the State's case-in-chief. He did not move for a directed verdict after the defense's case-in-chief. Rather, Childress submitted a proposed peremptory instruction that Childress be found not guilty of first-degree murder. The trial court denied the instruction.

¶32. The trial court denied Childress's motion for a directed verdict after the State's case based on precedent setting forth long-settled law in this state. "Malice or intent . . . as a matter of law, may be proved or inferred from the use of a deadly weapon." **Fairchild v. State**, 459 So. 2d 793, 802 (Miss. 1984) (citing **Shields v. State**, 244 Miss. 543, 144 So. 2d 786 (1962), *overruled on other grounds by* **Flowers v. State**, 473 So. 2d 164 (Miss. 1985)).

¶33. Deliberate-design murder, for which Childress was indicted, "is synonymous with 'malice aforethought.'" **Jones v. State**, 710 So. 2d 870, 877 (Miss. 1998) (quoting **Tran v. State**, 681 So. 2d 514, 517 (Miss. 1996)); *see also* **Brown v. State**, 965 So. 2d 1023, 1030 (Miss. 2007) ("[D]eliberate-design connotes an intent to kill and may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." (citing **Wilson v. State**, 936 So. 2d 357, 364 (Miss. 2006))). "[D]eliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." **Jones**, 154 So. 3d at 880 (alteration in original) (quoting **Brown**, 965 So. 2d at 1030).

¶34. We find that the record fully supports the trial court's decision to deny Childress's motion for a directed verdict after the State's case-in-chief and Childress's request for a peremptory instruction to the jury.

¶35. The State's case against Childress consisted of Childress's voluntary statement to authorities that he killed Hester by shooting her in the head, along with direct evidence that Hester was in fact killed by a gunshot wound to her head. Childress did not explain to authorities why or how the shooting occurred; he only said that he killed Hester by shooting her in the head.

¶36. The evidence showed that Hester was in a seated position in the utility room of her home with a pool of blood around her body, with splatters of blood on the adjacent wall and door immediately next to her body. There were no weapons of any kind found next to Hester's body or anywhere else in the utility room.

¶37. The jury was provided expert testimony regarding the location of the bullet wound to Hester's head, the condition of the wound, and the trajectory of the bullet after entry. The jury also was provided testimony regarding the revolver used and how many pounds of pressure is required to pull the trigger in both single- and double-action mode.

¶38. Testimony and exhibits submitted further showed a shattered glass door on the side of the house, along with evidence that blood found throughout the house belonged to Childress. Photographs submitted showed mail strewn on the floor, including pieces of mail addressed to Childress at a Neshoba County address.

¶39. Evidence also was submitted that when Childress told Neshoba County authorities that he had shot and killed Hester, he also told them that he thought he may have shot himself in the foot. He did not tell authorities that Hester had pointed a gun at him.

¶40. After the trial court denied Childress's motion for a directed verdict, Childress took the witness stand and gave his version of what occurred. Childress admitted to being in a rage against Hester, grabbing his revolver, cocking the hammer, confronting her in the utility room, and holding the gun above her head, all while intoxicated. He repeatedly told the jury, that the gun "went off, and she dropped to the ground."

¶41. Childress did not explain how the gun went off. He just maintained throughout his testimony that the gun went off while he was holding it above Hester's head.

¶42. Childress acknowledged that Hester was not physical with him when they were in the utility room and that they were just yelling at each other. Childress also said that he did not know whether Hester had any weapons on her when they were in the utility room.

¶43. Childress admitted that he told law enforcement that Hester was going to kick him out of the house before he shot her. And he told the jury that he and Hester had discussed ending their relationship.

¶44. Childress also acknowledged that he likely told Neshoba County authorities he might have shot himself in the foot when that was not the case. Instead, he had cut his foot on a shard of glass from the shattered glass door.

¶45. The State confronted Childress with a photograph showing a small-caliber handgun. Childress said that was Hester's gun and that it was the one she had pointed at him. That

photograph and another showed the gun lying at the back of a kitchen counter next to the stove under an unopened pack of cigarettes.

¶46.   As mentioned, the jury was instructed on first-degree murder, second-degree murder, and three different theories of manslaughter.  The jury rejected the claim that Childress shot Hester negligently.  *Evans v. State*, 562 So. 2d 91, 94 (Miss. 1990) (defining culpable-negligence manslaughter).  The jury also rejected the claim that Childress shot Hester "under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm."  *Brown v. State*, 222 So. 3d 302, 307 (Miss. 2017) (internal quotation mark omitted) (quoting *Ronk v. State*, 172 So. 3d 1112, 1126 (Miss. 2015)) (defining imperfect-self defense manslaughter).  Nor did the jury conclude from the evidence that Hester provoked Childress in such a way as to render Childress's mind with "the highest degree of exasperation." *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001) (citing *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991)) (defining heat-of-passion manslaughter).

¶47.   The jury further rejected the proposition that Hester was killed during an eminently dangerous act evincing a depraved heart, although without premeditated design.  *Holliman v. State*, 178 So. 3d 689, 698 (Miss. 2015) (defining second-degree murder).  Rather, the jury concluded that Childress shot Hester with deliberate design to effect her death.

¶48.   The evidence supports the jury's conclusion.  Hester was found deceased in her utility room from a gunshot wound directly in the center and at the top of her head.  She was seated in a pool of blood, unarmed.  And there were no signs of a physical struggle.

12

¶49. Childress admitted to the shooting, and his only explanation for it was that his gun went off while he was holding it above Hester's head while the two were arguing. Childress admitted that he was in a rage at the time, that he was intoxicated, and that he wanted to commit suicide afterwards.

¶50. As mentioned, the jury could reasonably infer deliberate-design murder from the State's evidence alone. And we find nothing in Childress's testimony that contradicted the physical facts and circumstances presented by the State in any significant way.

¶51. The jury clearly rejected Childress's claim that the gun just went off while he was holding it above Hester's head when the two were arguing. From the evidence presented, one could reasonably conclude that Childress's account was implausible, if not impossible.

¶52. Accordingly, we find no merit to Childress's claim that the evidence is insufficient to support deliberate-design murder.

## II. Weight of the Evidence

¶53. Alternatively, Childress argues that the weight of the evidence in this case does not support a first-degree murder conviction. Instead, the weight of the evidence supports only a manslaughter conviction.

¶54. As Childress acknowledges, "[w]hether a homicide is classified as a murder or manslaughter is ordinarily an inquiry to be made by the jury." *Moore v. State*, 52 So. 3d 339, 347 (Miss. 2010) (internal quotation marks omitted) (quoting *Hodge v. State*, 823 So. 2d 1162, 1166 (Miss. 2002)).

¶55.   Here, the jury rejected each theory of manslaughter submitted to it.  The cases relied on by Childress are distinguishable from the facts here.

¶56.   In *Clemons v. State*, 473 So. 2d 943, 945 (Miss. 1985), this Court reversed a murder conviction and remanded for resentencing for manslaughter.  The *Clemons* Court found that "there is such contradictory testimony that it is virtually impossible to reconstruct what actually happened."  *Id.* at 944.  In that case, multiple witnesses observed a bar fight that began inside the bar, spilled out into the street, and resulted in a fatal stabbing.  Differing accounts told the identity of the aggressor and what had occurred at the time of the stabbing. *Id.* at 944-45.  The *Clemons* Court concluded "that the facts are not sufficient to support the conviction for murder and that the verdict is against the overwhelming weight of the evidence."  *Id.* at 945.

¶57.   It is not virtually impossible to reconstruct what happened here.  Childress admitted to authorities that he shot and killed Hester.  She was found shot to death in her utility room, execution style.  At trial, Childress could remember specific details he claimed had occurred before the shooting and afterwards.  But he could not remember what exactly occurred in the utility room other than he and Hester were standing face to face arguing while Childress was holding a gun above her head that then "went off."

¶58.   The jury obviously did not believe Childress's version of what occurred, nor was it required to given the State's evidence.

¶59.   Childress also cites *Tait v. State*, 669 So. 2d 85, 91 (Miss. 1996), in which this Court reversed a second-degree murder conviction and remanded the case for resentencing for

14

culpable-negligence manslaughter. Eyewitness testimony showed that two juveniles had been playing with a gun all day. *Id.* at 89. Later in the day, the defendant picked up a bracelet and asked the victim if he could wear it. *Id.* The victim said no, and the two "started joking around and horseplaying." *Id.* According to the eyewitness, the defendant grabbed the gun, cocked it, put it to the victim's head, "and the gun went off." *Id.* The defendant immediately fell to the ground crying. *Id.*

¶60. Childress and Hester were not horseplaying when the shooting occurred. Childress admitted that he was enraged at Hester after she pulled a gun on him. Evidence, however, was submitted from which a rational trier of fact could conclude that Hester did not pull a gun on Childress and that he had been enraged at Hester for some other reason.

¶61. Again, photos were submitted that showed Hester's gun in a location away from immediate reach. And Childress admitted that he never told authorities after the shooting that Hester had pulled a gun on him.

¶62. Childress admitted that the two had discussed ending their relationship. And though he denied that was the case during his testimony at trial, Childress acknowledged that he initially told authorities after the shooting that Hester was kicking him out.

¶63. Numerous conflicts and discrepancies existed between what Childress initially told authorities and what he later said at trial. The conflicts and discrepancies involved Childress's credibility, and it was for the jury to assess the weight and credibility of all the evidence. *Mujahid v. State*, 324 So. 3d 275, 280 (Miss. 2021) ("[I]it is the jury that assesses witness credibility and the weight and worth of testimony.") (citing *Robinson v. State*, 247 So. 3d 1212, 1227 (Miss. 2018))).

¶64. We find that the jury's verdict was not "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Willis*, 911 So. 2d at 950 (citing *Stewart*, 909 So. 2d at 57). Accordingly, this issue is without merit.

## CONCLUSION

¶65. Childress's conviction for deliberate-design murder is affirmed.

¶66. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**